UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
STEVEN PALMORE,                                    Docket No.: 09-CV-5269 (WFK)(JO)

                                 Plaintiff,

                -*v.*-

ONTEL CORPORATION and XIAMEN EVERE          ***PLAINTIFF'S   EXHIBITS   FOR***
SPORTS GOODS CO., LTD.,                      ***DAMAGES        HEARING***

                           Defendants.
------------------------------------------------------------------X

      **PLEASE TAKE NOTICE** that the plaintiff will submit the following exhibits at the

damages hearing:

| | |
|---|---|
| Exhibit "A" | Affidavit of Irving Friedman, M.D.; |
| Exhibit "B" | Operative Reports of Michael Schulder, M.D.; |
| Exhibit "C" | Reports by VerdictSearch of Comparable Verdicts; |
| Exhibit "D" | Photos of Steven Palmore in Hospital; |
| Exhibit "E" | Photos of Steven Palmore Performing. |

Dated: New York, New York
        March 19, 2012

SAKKAS,   CAHN   &   WEISS,   LLP

By: _____

MATTHEW SAKKAS, ESQ.
Attorneys for Plaintiff
150 Broadway, Suite 1307
New York, N.Y.  10038
Tel:    (212)571-7171
Fax:    (212)571-7174

Exhibit "A"  -  AFFIDAVIT OF IRVING FRIEDMAN, MD

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

STEVEN PALMORE,                                    Docket No.: 09-CV-5269 (WFK)(JO)

                                    Plaintiff,


              -v.-


ONTEL CORPORATION and XIAMEN EVERE        *AFFIDAVIT   OF   IRVING*
SPORTS GOODS CO., LTD.,                    *FRIEDMAN,     M.D.*

                                    Defendants.

-----------------------------------------------------------------X

STATE OF NEW YORK        )
                         ) SS.:
COUNTY OF KINGS          )

       Irving Friedman, M.D., being duly sworn, makes the following statement under penalty

of perjury:

       1.      I am a physician duly licensed to practice medicine in the State of New York.

       2.      A copy of my curriculum vitae is annexed hereto as Exhibit "1".

       3.      On January 20, 2011 I examined Steven Palmore and conducted a review of his

medical records at the request of his attorney, Matthew Sakkas.

       4.      Thereafter, I prepared a report of the same date.  A copy of that report is annexed

hereto as Exhibit "2".

       5.      In my report I documented, among other things, Mr. Palmore's complaints, his

history, the physical exam, the record review, and my opinions concerning his diagnosis,

prognosis, causation, permanency and future medical care.

-1-

6.     The statements of fact and opinions which I state in my report are true to the best of my knowledge.  The opinions which I state in my report are all made to a reasonable degree of medical certainty.

7.     I understand that this Court will conduct an inquest on damages.  If I was called to the witness stand I would testify to all of the matters stated in my report.  Accordingly I request that this Court accept my report in lieu of my live testimony.

Irving Friedman, M.D.
575 Kings Highway
Brooklyn, NY 11223

Sworn to before me on the
14th day of March, 2012.

Notary Public

MARTIN L PRICE
NOTARY PUBLIC, State of New York
No. 24-4525838
Qualified in Kings County
Commission Expires Oct. 11, 2014

IRVING FRIEDMAN, M.D.
575 KINGS HIGHWAY
BROOKLYN, NEW YORK 11223
TEL: (718) 375-9400 FAX: (718) 375-9403
PIN D38931

-2-

Exhibit "1"-   CV of Irving Friedman, M.D.

RECEIVED   03/02/2012 15:34   12126931314   SAKKAS CAHN WEISS

## IRVING FRIEDMAN, M.D.
## 575 KINGS HIGHWAY
## BROOKLYN, NEW YORK 11223

**EDUCATION:**

Downstate Medical Center, 1971 - 1975
Yeshiva University, Pre-Med Major, 1967 - 1971
Isaac M. Lobell Institute, Chem-Physics Major,
1963 - 1967

**PROFESSIONAL
TRAINING:**

Chief Resident of Neurology,
Downstate Medical Center, 1978 - 1979

Resident in Neurology, Downstate Medical Center
1975 - 1976

Straight Medical Internship, Maimonides Medical
1975 - 1976

**LICENSURE:**

New York State, Medical License # 127617,  1976

**SPECIALITY
BOARDS:**

American Board of Neurology and Psychiatry, 1980
American Board of Qualification in EEG,
Neurophysiology, 1979

**HOSPITAL
AFFILIATIONS:**

Attending Physician, Long Island College Hospital,
Brooklyn, New York - 1986 - 1992

Attending Physician, New York Eye and Ear Infirmary,
New York, New York -  1992

Assistant Clinical Professor, Downstate Medical Center
SUNY - Brooklyn, New York.    Emeritus

Attending Physician, Brookdale Hospital Medical
Center, Brooklyn, New York  1979 - 1990

Director, EEG Laboratories, Brookdale Hospital
Medical Center, Brooklyn, New York  1979 - 1987

**PRIVATE
PRACTICE**

Clinical Director, Neurological Division
575 Kings Highway , Brooklyn, New York 11223

Exhibit "2"-   Report Concerning Steven Palmore, Dated January 20, 2011

# IRVING FRIEDMAN, M.D.

| DIPLOMATE | 575 KINGS HIGHWAY | DIPLOMATE |
|---|---|---|
| AMERICAN BOARD OF | BROOKLYN, NEW YORK 11223 | AMERICAN BOARD OF |
| NEUROLOGY AND PSYCHIATRY | TEL. (718) 375-9400 | NEUROPHYSIOLOGY |
| | FAX (718) 375-9403 | |

January 20, 2011

Sakkas, Cahn & Weiss, LLP
150 Broadway
Suite 1307
New York, New York  10038

Attn:  Mr. Matthew Sakkas

Re:  Steven Palmore
      94-26 225th Street
      Queens Village, New York  11428
      D/A: 11/28/08
      DOB: 10/20/54

Dear Mr. Sakkas:

I saw Mr. Steven Palmore for neurologic and medical assessment and review of extensive records on Thursday, January 20, 2011.  Mr. Palmore is being seen with specific reference to injuries sustained via an iron gym (that collapsed) on November 28, 2008.   He was admitted to Long Island Jewish Medical Center from November 28, 2008 through December 2, 2008.  He was readmitted to Long Island Jewish Medical Center on December 9, 2008 for multiple cervical spine surgery and instrumentation on transferred to Southside Rehabilitation on December 23, 2008.  (Extensive records were reviewed.  A synopsis will follow).

**CURRENT CHIEF COMPLAINTS:** Chronic neck pain, restricted range of motion at the cervical spine as well as numbness and weakness of both hands. "I've had nightmares and flashbacks.  I had no feeling in my body after I fell. I wish I could play instruments like I used to before."

**CURRENT MEDICAL ILLNESSES:**  There is no history of diabetes or hypertension.

**FAMILY HISTORY:**  Mr. Palmore has no children.

**HANDEDNESS:**  He is right hand dominant.

Steven Palmore                    -2-               January 20, 2011

**WORK HISTORY:** The patient has worked as a N.Y.C. Public School teacher, i.e. teaching music for many years. He is a professional musician, lift-long. "I played nine instruments."

**CURRENT MEDICATIONS:** Gabapentin, 600 mgs. t.i.d.

**PHYSICAL EXAM:** Reveals an alert, cooperative man. His speech is fluent. He denies any prolonged period of loss of consciousness. He does complain of chronic occipital headaches and neck pain.

PERLA. EOM's are full. The disks are benign. There is no nystagmus. There is no facial asymmetry. There is no facial scarring. Tongue movements are midline. There is no facial percussion pain. There is no TMJ percussion pain. There is no tardive dyskinesia. The TM's are clear. There is no gross hearing loss to tuning fork examination. He denied any vertigo. 2+ Percussion pain with multiple myofascial trigger points were present in the bilateral parieto-occipital regions.

Lungs were clear to auscultation. Heart rate was regular. Blood pressure was 120/70 seated in the right arm.

Cervical spine: Surgical scars are present from the posterior approach, i.e. 14 cm. midline and the right anterior approach. 2+ Spasm with multiple myofascial trigger points were present in the bilateral paracervical and peri-scapular regions.

Cervical flexion was guarded to 15 degrees out of 45. Cervical extension was extremely guarded, i.e. the patient could not extend at all due to hardware that was in place. "I can't look up at the ceiling." Cervical rotation was guarded to 30 degrees out of 90 right and left.

Grip was decidedly diminished in both hands. DTR's were brisk and symmetrical in both upper extremities. Moderate intrinsic hand muscle atrophy was present including thenar, hypothenar and FDI musculature.

Steven Palmore                    -3-                    January 20, 2011


Mr. Palmore was hypesthetic in a bilateral median distribution to pin prick. Position and vibratory sensation were intact at the fingertips.

Rapid alternating movements were done clumsily.  No fasciculations or myoclonic jerks were noted.  "I try and play the musical instruments.  I can't play like I used to.  I don't have the feelings or the strength.  I force myself to do it.  Music is my life."

Strength in the upper extremities – proximal 4.5/5 bilaterally.  Distally 4.5/5 bilaterally.

Lumbar spine:  1+ Spasm was present in the paralumbar regions.  The patient was able to forward flex 60 degrees out of 90.  Straight leg raising was positive bilaterally at 60 degrees out of 90.  Knee jerks ankle jerks were very brisk and symmetrical.  A few beats of clonus were present at both ankles.

Gait was within normal limits.  Romberg's was positive.  The patient had difficulty with tandem gait.  He had difficulty walking alternating on his toes and heels.  "I don't have the balance."

The patient complained of urinary frequency.

No fasciculations or myoclonic jerks were noted in the lower extremities. Homan's was negative bilaterally.

Mr. Palmore had reasonably intact pin, position and vibratory sensation at the toes.

In addition to the above, Mr. Palmore admitted to chronic depression and anxiety over the past 2+ years.  "I've had nightmares and flashbacks.  After I fell I had no feelings in my body at all.  I couldn't believe what happened to me."

Steven Palmore                    -4-                    January 20, 2011


## REVIEW OF RECORDS:

(1)  Records of initial treating hospital, Long Island Jewish Medical Center November 28, 2008.

CAT of the head without contrast November 28, 2008.  "On the head CT there is no evidence for calvarial fracture or acute intracranial hemorrhage."

CAT scan of the cervical spine November 28, 2008.  (1) "There is no evidence for acute fracture, subluxation or prevertebral hematoma.  (2) At the C2-C3 level, a small disc bulge is present.  (c)  At the C3-C4 level, a right paracentral disc herniation and disc osteophyte complex is present resulting in moderate right-sided spinal cord compression.  The spinal cord compression is better visualized on the cervical spine MRI study.  Moderate right-sided neural foraminal narrowing is present secondary to facet and uncovertebral joint hypertrophy.  (d) At the C4-C5 level, a broad disc bulge and disc osteophyte complex, moderate central spinal canal stenosis and mild spinal cord compression are noted.  The spinal cord compression is better visualized on the MRI study.  (e) At the C5-C6 level, a central disc herniation and disc osteophyte complex are noted causing flattening of the ventral thecal sac, but without frank cord compression.  (f)  At the C6-C7 level, a disc osteophyte complex with a small central disc herniation is present causing mild spinal canal stenosis.  Moderate right-sided neural foraminal narrowing is present."

MRI of the cervical spine November 29, 2008.  (a) "At the C3-C4 level, a right paracentral disc herniation and disc osteophyte complex is present resulting in moderate right-sided spinal cord compression.  (b) At the C4-C5 level, a broad disc bulge and disc osteophyte resulting in mild spinal cord compression.  (c)  Minimal patchy increased T2 signal is present in the spinal cord at the C3-C4 through C4-C5 levels which most likely represents minimal edema within the cord given the clinical history of neurologic symptoms and recent trauma.  There is no evidence of spinal cord hemorrhage."

Mr. Palmore was kept under observation and was discharged on December 2, 2008.

Steven Palmore                    -5-                January 20, 2011

(2)  CAT scan of the abdomen and pelvis performed on December 3, 2008.
"Etiology for abdominal pain not elucidated."

(3)  Pelvic CT with contrast performed on December 3, 2008.  "Etiology for
abdominal pain not elucidated."

(4)  Due to signs of spinal cord edema and central cord syndrome, the patient
was readmitted to North Shore Hospital on December 9, 2008 for surgical
stabilization surgery both anterior and posterior.

(5)  Operative report December 9, 2008.  Surgeon:  Dr. Michael Schulder.
Pre-operative and post-operative diagnosis:  "C3-C4 herniated cervical disc."

Nature of Operation:  "Anterior cervical discectomy, arthrodesis, graft and
fusion, with anterior cervical instruments and microsurgery."

Clinical Note:  "The patient is a 54 year old man who was exercising 10 days
earlier.  He fell on the back of his head and was admitted to LIJ with a
central cord syndrome.  This rapidly improved and he was discharged three
days after admission."

Operative Report:  "The discectomy at C3-C4, the discectomy was completed
with a variety of curettes and small rongeurs.  A Synthes zero-P interbody
spicer was selected.  The spacer fit snuggly in the disc space.  Four screws,
two cranially and two caudally were placed in the standard fashion."

(6)  Second operative report December 9, 2008.  Pre-operative and post-
operative diagnosis:  "Cervical stenosis."  Surgeon:  Dr. Michael Schulder.

Nature of Operation:  "C3-C7 laminectomy, arthrodesis C3-C4, C4-C5, C5-C6,
and C6-C7 with fusion bilaterally, lateral mass screws, C3, C4, C5, C6, bilater-
ally with instrumentation from C3 through C6."

(7)  Mr. Palmore was discharged for rehabilitation on December 12, 2008.

Steven Palmore                     -6-                    January 20, 2011


He was kept at Southside Rehab through December 23, 2008.

(8)  Multiple physical therapy and occupational therapy treatment notes
are available for review.

(9)  Post-op CT of the cervical spine performed on December 11, 2008.
Impression:  (a)  "Status post multi-level cervical laminectomy and fusion...
(b)  Multi-level neural foraminal narrowing...  (c)  Spinal canal not well
evaluated due to streak artifact of spinal hardware."

(10)  Consultation by Dr. Sunil Albert December 15, 2008.  "The patient
rates the pain 8 out of 10...  There is referral of pain into the bilateral
trapezius, scapular regions and shoulders.  The patient also states that
there is radiation of pain down into the bilateral arms, forearms, hands,
and this is associated with numbness and tingling in the fingertips.  He
describes the pain as burning and shooting light.  His pain is aggravated
by movement."

(11)  Mr. Palmore was kept on numerous narcotic analgesics including
OxyContin, Dilaudid and Kadian.

(12)  Updated note from Dr. Michael Schulder January 6, 2009.  "Mr. Palmore
is recovering from surgery as expected and is neurologically intact."

(13)  Follow up from Dr. Michael Schulder June 10, 2009.  "Overall, he says
his pain is 3 out of 10.  He remains on Neurontin and Lidoderm Patches."


**IMPRESSION & ANALYSIS:** As a result of injuries sustained via a collapsed
iron gym, i.e. falling on the back of his head and spine on November 28, 2008,
Mr. Steven Palmore has sustained the following deficits:
(1)  Acute post-traumatic central cord syndrome with spinal cord edema C3-C4
and C4-C5.
(2)  Post-traumatic disc herniations C3-C4, C4-C5, C5-C6 and C6-C7.

Steven Palmore                    -7-                    January 20, 2011

(3)  Chronic post-traumatic cervical bilateral radiculopathy and myofascitis.
(4)  Marked aggravation and exacerbation of clinically totally quiescent
disc osteophyte complexes C3-C4, C4-C5, C5-C6 and C6-C7.
(5)  Status post anterior approach surgery December 9, 2008 with anterior
cervical discectomy, arthrodesis, graft and fusion.
(6)  Status post posterior approach surgery on December 9, 2008 with
C3-C7 laminectomy.
(7)  Arthrodesis C3-C4, C4-C5, C5-C6 and C6-C7 with fusion bilaterally.
(8)  Status post placement of lateral mass screws C3-C4 and C5-C6 bilat-
erally with instrumentation C3 through C6.
(9)  Chronic post-traumatic quadriparesis due to cervical spinal cord trauma.
(10)  Chronic pain syndrome with affective disturbances including anxiety,
depression, insomnia and fatigue.

**DEGREE OF DISABILITY:**  Mr. Palmore remains with a significant and
painful disability at this time.  He remains with daily cervical paraspinal
spasm, marked restriction of range of motion of the cervical spine, especially
at cervical extension, but also including flexion, head tilt and rotation.  The
patient remains with weakness and numbness of both hands and limitation
of being able to use his musical instruments, i.e. he is a professional
musician.

**CAUSALITY:**  The above multiple neuro-spinal deficits are directly and causally
related to the injuries sustained on November 28, 2008, i.e. the patient became
acutely symptomatic at that time, i.e. he was totally asymptomatic prior to
that and denies any prior neck or upper extremity difficulties.

**PROGNOSIS:**  The patient's prognosis for any further functional improve-
ment is extremely poor, i.e. he remains grossly symptomatic more than two
years following his injuries with range of motion deficits, persistent spasm as
well as motor and reflex deficits.

**PERMANENCY:**  The above post-traumatic neuro-spinal deficits are to be
considered permanent in nature and causally related.

Steven Palmore                    -8-                    January 20, 2011

**FUTURE TREATMENTS:**  (1)  I have encouraged Mr. Palmore to exercise to his tolerance.
(2)  He will be continuing Neurontin for his neuropathic type pain.
(3)  I am allowing him Percocet 10/325 PRN severe spasm and pain.
(4)  The patient requires regular neuro-spinal follow up in view of his spastic quadriparesis, i.e. he requires follow up to check for any progressive myelo-pathy.
(5)  Any further weakness/numbness of his hands or progressive spinal cord compression, would warrant repeat and/or more extensive surgical stabiliza-tion surgery in the future.

I, Irving Friedman, a duly licensed physician to practice in the State of New York (license #: 127617), do hereby affirm that the foregoing report is true to the best of my knowledge under the penalties of perjury.

Sincerely,

Irving Friedman, M.D.

IF:mb

Exhibit "B"  -  OPERATIVE REPORTS OF MICHAEL
                SCHULDER, MD

NORTH SHORE – LONG ISLAND JEWISH HEALTH SYSTEM

# NORTH SHORE UNIVERSITY HOSPITAL

300 COMMUNITY DRIVE, MANHASSET, NEW YORK, 11030  •  (516) 562-0100

**PATIENT NAME:  PALMORE, STEVEN L**
**DATE OF OPERATION: 12/09/2008**
**MEDICAL RECORD #: 40307992**
**ENCOUNTER #: 500004116942**
**SURGEON: MICHAEL SCHULDER, MD**

## OPERATIVE REPORT

**FIRST ASSISTANT:**     AHMED LATEFI, DO (127738)

**PREOPERATIVE DIAGNOSIS:** Cervical stenosis.
**POSTOPERATIVE DIAGNOSIS:** Same.
**NATURE OF OPERATION:** C3-7 laminectomy, arthrodesis C3-4, C4-5, C5-6 and C6-7 with fusion bilaterally, lateral mass screws C3, C4, C5, C6 bilaterally with instrumentation from C3 through C6.

**ESTIMATED BLOOD LOSS:** 300 cc.
**COMPLICATIONS:**     None.

**CLINICAL NOTE:** The patient is a 54-year-old man who sustained a central cord syndrome because of a herniated cervical disk and cervical stenosis 10 days earlier. He had just completed an anterior C3-4 diskectomy and maintained his neurological examination on a wake up test. He was now to have the posterior portion of the surgery done.

**OPERATIVE PROCEDURE:** Full anesthesia was re-induced. The Mayfield clamp was applied. The patient was turned prone and positioned on bolsters. All pressure points were padded. His head was maintained in a neutral alignment. The fluoroscopic C-arm was positioned. We confirmed that there was no movement of the anterior instrument.

The neck was prepped and draped in the usual sterile fashion. A 12 cm incision was made over the posterior spine. The spine was exposed and deep retractors were placed. We confirmed our levels with fluoroscopy. Lateral mass screws were then placed in C3, C4, C5 and C6 bilaterally. Each screw was checked with fluoroscopy although we had limited views at C5 and C6 because of the patient's high shoulders. EMGs were done through the pedicle probe as well as the screws themselves and no abnormal nerve activity was obtained at any time.

Page 1 of 2

3A

NORTH SHORE – LONG ISLAND JEWISH HEALTH SYSTEM

# NORTH SHORE UNIVERSITY HOSPITAL

300 COMMUNITY DRIVE, MANHASSET, NEW YORK, 11030  •  (516) 562-0100

**PATIENT NAME: PALMORE, STEVEN L**
**MEDICAL RECORD #: 40307992**

Laminectomies of C3-C7 was then performed using various rongeurs. We were able to observe normal spinal cord pulsations through the dura. Bone and ligament were removed until we could pass a thin Penfield dissector on either side of the dura without difficulty. Epidural hemostasis was obtained with Gelfoam. The facet joints were denuded of ligament. Decortication of the exposed lateral bone was then done with a high speed drill. Bone graft taken from the laminectomy that had been appropriately debrided of soft tissue and morselized was placed in the facets and on the exposed decorticated bone. These were also held in place with Grafton gel.

Two slightly lordotic rods were cut to an appropriate length and secured to the lateral mass screws (this was the Synthes Synapse system). A crosslink was placed as well and fluoroscopy confirmed appropriate alignment and placement of these instruments. A medium Hemovac drain was placed over the dura and let out through a separate stab incision. The incision was closed with Vicryl and staples. A sterile dressing was applied. The patient was turned supine and brought to the neurosurgical ICU in critical but stable condition.

_____

DICT:      MICHAEL SCHULDER, MD (128439) 12/09/2008
TRANS:    ST/CAS 12/09/2008
JOB:       758987

Electronically Signed by:  MICHAEL SCHULDER 12/15/2008 11:09:05 AM

NORTH SHORE – LONG ISLAND JEWISH HEALTH SYSTEM

# NORTH SHORE UNIVERSITY HOSPITAL

300 COMMUNITY DRIVE, MANHASSET, NEW YORK, 11030 • (516) 562-0100

**PATIENT NAME: PALMORE, STEVEN L**
**DATE OF OPERATION: 12/09/2008**
**MEDICAL RECORD #: 40307992**
**ENCOUNTER #: 500004116942**
**SURGEON: MICHAEL SCHULDER, MD**

## OPERATIVE REPORT

**FIRST ASSISTANT:**     AHMED LATEFI, DO (127738)

**PREOPERATIVE DIAGNOSIS:** C3-4 herniated cervical disk.
**POSTOPERATIVE DIAGNOSIS:** Same.
**NATURE OF OPERATION:** Anterior cervical diskectomy, arthrodesis, graft and fusion, with anterior cervical instruments and microsurgery.

**ESTIMATED BLOOD LOSS:**  20 cc.
**COMPLICATIONS:**         None.

**CLINICAL NOTE:** The patient is a 54-year-old man who was exercising 10 days earlier. He fell on the back of his head and was admitted to LIJ with a central cord syndrome. This rapidly improved and he was discharged three days after admission. MRI and CT scan had shown a C3-4 herniated disk with cervical stenosis from C3 through C6. Plan was for elective admission with an anterior diskectomy followed by a C3-7 laminectomy and posterior fusion.

**OPERATIVE PROCEDURE:** In the operating room, general endotracheal anesthesia was induced. Evoked potential monitoring was begun. Somatosensory and motor evoked potentials remained unchanged throughout this and the subsequent procedure.

The patient was positioned supine with all pressure points padded. His head was slightly extended and supported on a donut. The anterior neck was prepped and draped in the usual sterile fashion. The C-arm fluoroscope was positioned and draped for imaging throughout the case.

A 4 cm incision was made in an upper skin crease. The platysma was divided. The plane between the sternomastoid laterally and the medial strap muscles and trachea was opened. The carotid sheath was reflected

3A

Case 1:09-cv-05269-WFK-JO    Document 39    Filed 03/20/12    Page 21 of 53 PageID #: 303

NORTH SHORE – LONG ISLAND JEWISH HEALTH SYSTEM

# NORTH SHORE UNIVERSITY HOSPITAL

300 COMMUNITY DRIVE, MANHASSET, NEW YORK, 11030  •  (516) 562-0100

**PATIENT NAME: PALMORE, STEVEN L**
**MEDICAL RECORD #: 40307992**

laterally and the esophagus medially. The anterior cervical spine was identified. A spinal needle was placed in the C3-4 disk space, and this was confirmed with fluoroscopy.

The longus coli muscles were detached across the C3-4 disk space from the anterior spine. A Caspar retractor system was used, with care taken to ensure that the blades remained under the raised longus colli muscles.

A C3-4 diskectomy was then begun and specimens were sent to pathology. When about half the disk was removed, vertebral distraction posts were placed in C3 and C4 and the disk space opened by several millimeters. We confirmed appropriate placement of the posts and opening of the disk space with fluoroscopy. The operating microscope was brought into the field.

The diskectomy was completed with a variety of curettes and small rongeurs. The longitudinal ligament was identified and opened. We exposed the dura throughout the length of the disk space and confirmed complete decompression of the spinal cord at this level.

The end plates were decorticated. A Synthes zero-P interbody spacer was selected. This was done using a trial spacer and selecting the ideal size with the disk space distracted. The height of the spacer was 6 mm in a lordotic configuration. The center of the spacer was filled with Progenix demineralized bone matrix.

The spacer fit snugly in the disk space. Four screws, two cranially and two caudally were placed in the standard fashion. Each one was checked on fluoroscopy before final tightening.

After irrigation, a medium Hemovac drain was placed and brought out through a separate stab incision. The incision was closed using 3-0 and 4-0 subcuticular Vicryl and Steri-Strips. Sterile dressing was applied. A "wake up test" was then done and we confirmed that the patient was moving all limbs.

3A

NORTH SHORE – LONG ISLAND JEWISH HEALTH SYSTEM

## NORTH SHORE UNIVERSITY HOSPITAL

300 COMMUNITY DRIVE, MANHASSET, NEW YORK, 11030 • (516) 562-0100

**PATIENT NAME: PALMORE, STEVEN L**
**MEDICAL RECORD #: 40307992**

The general anesthesia was then re-induced for beginning of the following procedure.

Electronically Signed by:  MICHAEL SCHULDER 12/15/2008 11:07:39 AM

DICT:        MICHAEL SCHULDER, MD (128439) 12/09/2008
TRANS:     ST/CAS 12/09/2008
JOB:         758983

3A

Exhibit "C"  -  REPORTS OF VERDICT SEARCH of
COMPARABLE VERDICTS

XII/5-5    FALLDOWN   WATER ON BATHROOM FLOOR   **HERNIATED CERVICAL** DISCS

Frederick Polipo v. Edith Sanders and Harold Berkowitz as trustee of the trust in the last will and testament of Jenny Berkowitz and "John Doe" /Edith Sanders and Harold Berkowitz as trustee of the trust in the last will and testament of Jenny Berkowitz v. L.F.L. Unisex Salon Ltd.  15560/87  2-week trial  Verdict 7/11/94  Judge Bernard Burstein, Bronx Supreme

VERDICT:   $5,968,000, reduced to $5,908,320 for 1% comparative negligence of Pltf.  Remaining liability: Sanders and Berkowitz 99% negligent.  Third-party Deft. was dismissed after the close of Deft.'s case.  "John Doe" did not appear at trial.  Breakdown: $3,000,000 for past pain and suffering; $156,000 for past lost earnings; $2,500,000 for future pain and suffering; $312,000 for future lost earnings.  Jury: 4 male, 2 female.

Pltf. Atty:  David L. Feld of Esterman & Esterman, Manhattan
Deft. Atty:  Andrew G. Tolan of Langan & Levy, Manhattan, for Sanders and Berkowitz
James S. Burbage of Pellini & Poblete, Manhattan, for Third-party Deft.

Facts:     Pltf., a 41-year-old hairdresser employed by Third-party Deft. Unisex Salon (dismissed), resided in an apartment above the salon in the Bronx.  The workers in the salon complained in November 1983 to Deft. Sanders, the landlord (99% liable), that there was a leak from the second- floor apartment and asked him to fix it.  Deft. told the salon employees to hire a plumber to repair the leak.  The plumber, "John Doe," came to repair the leak and told the landlord that the bathroom needed additional remodeling.  The remodeling was completed on 12/31/83.  Pltf. claimed that on 1/4/84 he walked into the bathroom, saw a puddle of water on the floor, and then slipped and fell as he was leaving.  Pltf. argued that the leak was caused by the plumber improperly connecting the drainpipe of the sink.

Deft. landlord testified that the salon was the plumber's gratuitous agent and that it was responsible for his actions.  Defts. contended that Pltf. was comparatively negligent for the incident because he testified that he was aware of the existence of the water prior to entering the bathroom.

Injuries: **herniated** discs at C4-5 and C5-6.  Pltf. underwent a **discectomy** at C5-6.  Pltf. claimed that he has numbness in his hands and arms and limitation of motion.  He also claimed that he was unable to return to work.  Deft. contested the injuries, arguing that Pltf. sustained them after the alleged incident when he was assaulted by the plumber because he was not paid for his services.  Defts. produced a copy of the complaint for assault filed by Pltf. which indicated that the plumber intentionally struck him on 2/12/84.  They also argued that the injuries were not as severe as Pltf. claimed.  The jury unanimously found that Pltf. was comparatively negligent and found (5/1) that he was 1% responsible.

Demonstrative evidence: hospital records; photographs of bathroom; copy of assault complaint.  Offer: $50,000 from each Deft. landlord and Third-party Deft.  Jury deliberation: 3 hours.  Carrier: ITT Hartford.  Pltf. Expert: Dr. Hal Gutstein, neurologist, Bronx.  Deft. Expert: Dr. Joseph Polifrone, neurosurgeon, Bronx.

XV/3-25    MOTOR VEHICLE  18-WHEELER TRUCK COLLIDES WITH SNOW PLOW WHILE TRYING TO PASS  **HERNIATED CERVICAL** DISCS WITH SURGERY

Raymond Dail v. John Bement, a/k/a BST Express, Inc.  8270/93  1-week trial  Verdict 6/9/97 Erie Supreme

Judge:    Joseph P. Glownia

Verdict:    $3,150,000 (6/0).  Breakdown: $500,000 for past pain and suffering; $2,500,000 for future pain and suffering (28 years); $150,000 for future medical expenses.  Jury: 5 male, 1 female .  The post-trial motion was denied in a decision dated 11/7/97.

Pltf. Atty:  Stephen R. Foley of Paul William Beltz, Buffalo
Deft. Atty:  Leo T. Fabrizi of Charles G. DiPasquale, Buffalo

Facts:    Pltf. was a 43-year-old snow plow driver for the State Dept. of Transportation on the date of this motor vehicle accident on 1/16/92 in the Town of Boston, New York.  Pltf. was operating a snow plow in the left lane of travel, traveling northbound on Rte. 219.  He was in the process of "winging back" the snow from the left side of the roadway, which involves plowing the snow that had blown and drifted into the left lane of travel, back off to the side of the road.  This roadway has two lanes of travel in each direction.  Deft., driving an 18-wheeler truck, attempted to pass Pltf.'s plow on the right.  Plow wings were stored flush with the truck, and projected out approximately 2 feet off the right side of the truck.  As Deft. tried to pass, his truck collided with one of the stored plow wings.  Pltf. claimed that Deft. admitted that he had to go off the shoulder of the road to pass Pltf.'s snow plow, in violation of Vehicle and Traffic Law §1131.  He further contended that Deft. violated Vehicle and Traffic Law §1123, because he should have known that he would be unable to pass safely under the conditions.  Pltf. claimed that Deft. admitted that he never saw the wing before he hit it.  Deft. argued that he did all that he could to pass the snow plow by moving far over to the right before passing, and contended that Pltf.'s plow obstructed part of the right lane.

Injuries: **herniated** disc at C6-7, confirmed by MRI a few months following the accident.  In August 1995, Pltf. underwent a **discectomy** with **fusion** surgery.  In August 1996, a further MRI revealed a **herniated** disc at C5-6, one level above the site of the **fusion** surgery, which, Pltf. claimed, was causally related to the surgery, that was necessitated by the accident.  Pltf.'s expert testified that **fusion** surgery is known to weaken the levels above and below the site and can lead to further **herniations**.  Deft. contended that Pltf.'s injury was the result of a re-injury of a pre-existing Spondylosis condition, and was the result of a degenerative process leading to the **herniation**, and was not trauma related.  Demonstrative evidence: model of the **cervical** spine; enlargements of economic charts and posters showing future medical expenses.  Offer: $60,000; demand: $ 750,000 (policy).  Note: We have been informed that at the close of Pltf.'s proof, Deft.'s personal attorney requested that the insurance carrier pay the policy of $750,000.  Royal failed to pay the policy.  Pltf. indicated that he would accept the $750,000 policy, however, Royal still refused to pay.  Pltf.'s counsel has indicated that a bad faith action is contemplated.  Jury deliberation: 45 minutes.  Carrier: Royal Ins. Co.

Pltf. Experts:  Dr. Thomas Cowan, rehabilitative medicine, Williamsville; Dr. Kenneth Murray, neurologist, Williamsville; Dr. Melvin Brothman, orth. surg., Buffalo, by subpoena; Ronald Reiber, Ph. D., economist, Canisius College, Buffalo.
Deft. Expert:    Dr. Melvin Brothman, orth. surg., Buffalo.

XVI/46-1   MOTOR VEHICLE   LEFT TURN   SUMMARY JUDGMENT ON LIABILITY
**HERNIATED CERVICAL** DISCS AND TORN GLENOID LABRUM

Linda and Peter Improta and Nicole Califano v. Fred Schillinger  1176/97  3-week trial  Verdict 3/9/99
Dutchess Supreme

Judge:   Joseph Jiudice

Verdict:   $2,577,000 total verdict broken down as follows:
$1,450,000 for Linda Improta.  Breakdown: $883,000 for past pain and suffering; $567,000 for future pain and suffering (17 years).
$15,000 for Peter Improta for loss of services.
$1,112,000 for Nicole Califano.  Breakdown: $639,000 for past pain and suffering; $473,000 for future pain and suffering (15 years).

Pltf. Atty:  Kenneth S. Oliver of Finkelstein, Levine, Gittelsohn & Partners, Newburgh
Deft. Atty:  Bruce A. Petito of Petito & Tomlins, Poughkeepsie

Facts:   On 1/18/97, Pltf. Linda Improta, a 44-year-old assistant to a school headmaster, was a passenger in a car that was being driven on Rte. 55W in Beekman by Pltf. Califano, an 18-year-old college student.  Pltfs. claimed that Deft.'s car made a left turn in front of their car.  Pltfs. were granted summary judgment on liability, and the trial proceeded on damages.

Injuries: Improta (44-year-old assistant to school headmaster  $ 1,450,000 verdict): **herniated cervical** discs at C5-6 and C6-7; possible **herniated** lumbar disc or contused nerve at L4-5.  Pltf. underwent a **discectomy** at C6-7 and the **herniated** disc at C5-6 became more symptomatic.  The **herniated** discs at C5-6 and C6-7 ultimately fused naturally and caused pressure and a subsequent **herniated** disc at C4-5.  Pltf. missed 8 months from work.  She claimed that when she returned, she lost many of her job functions because she was unable to perform them.  She testified that she is restricted in her daily activities.  Deft. claimed that Pltf.'s injuries were not as severe as she claimed.  Califano (18-year-old college student  $1,112,000 verdict): torn glenoid labrum of the left (nondominant) arm; **herniated cervical** disc at C5-6.  Pltf. was a track and field athlete who came in second place for the hammer throw in a national track and field competition.  She testified that she was aspiring to compete in the Olympics and that her injuries ended her sports career.  Deft. argued that Pltf.'s shoulder healed well following the surgery and that Pltf.'s condition worsened when she fell at home and aggravated the injury.  Carrier: State Farm.

Pltf. Experts:   Dr. Nilo Herrera, family practice, Holmes; Dr. Arnold Goran, neurosurgeon, Poughkeepsie; Dr. Joel Mandel, orth. surg ., New Windsor; Dr. Loren Rosenthal, neurologist, Poughkeepsie; Dr. Hilton Mirels, orth. surg., New Rochelle.   Deft. Experts:   Dr. Ralph Purcell, orth. surg., Tarrytown; Dr. Rene Elkin, neurosurgeon, Tarrytown.

XVII/14-15  MOTOR VEHICLE   POLICE OFFICER ON EMERGENCY CALL CUT OFF BY DEFENDANT   NO CONTACT   **HERNIATED CERVICAL** DISCS WITH SURGERY   REMITTITUR

Jeffrey Warner v. Adelphi University and Santo Novarro  3463/93  2- week trial  Verdict 7/13/99  Nassau Supreme

Judge:    R. Bruce Cozzens

Verdict:   $2,750,000 (6/0).  Breakdown: $600,000 for past pain and suffering; $2,000,000 for future pain and suffering (30 years); $40,000 for past medical expenses; $110,000 for future medical expenses.  Jury: 2 male, 4 female.

In a post-trial decision dated 8/30/99, the court reduced the verdict to $2,620,000 as follows: the $40,000 award for past medical expenses was reduced to $20,000, and the court set aside the $100,000 award for future medical expenses, finding that there was  no credible evidence  to support that portion of the award.  Decision at p. 1.

Pltf. Atty:  Joseph P. Ferri, Jr., Garden City
Deft. Atty:  James F. Furey of Perez & Furey, Uniondale

Facts:     Pltf. was a 38-year-old police officer on the date of the incident on 3/1/92.  He was responding to an emergency call when his patrol car was cut off by a security van driven by Deft. Novarro, an Adelphi University employee.  Pltf. testified that the lights and siren on his patrol car were on.  Pltf. was able to avoid a collision with Deft. s van, but lost control of his car, which jumped a curb and struck a mailbox.

Deft. contended that Pltf. s lights and siren were not on, and therefore he was not on an emergency call.  Deft. also claimed that Pltf. was speeding.

Injuries: **herniated cervical** discs with impingement, requiring a double **discectomy**.  Demonstrative evidence: MRI; model of **cervical** spine; anatomy diagrams showing a **herniated cervical** disc; diagram showing a double **discectomy**; hospital records.  No offer; final demand: $1,200,000.  Jury deliberation: 5 hours.  Carriers: Chubb ( primary   $1,000,000 policy); General Star (excess   up to $10,000, 000).

Pltf. Experts:   Dr. Mihai Dimancescu, treating neurosurgeon, Freeport; Dr. William Hopper, treating orth. surg., Oneonta.

Deft. Expert:    Dr. S. Murthy Vishnubhakat, neurologist, Manhasset.

XXI/1-33
MOTOR VEHICLE
Rear-ender
Driver eyed nearby accident and struck preceding car
Settlement  $1,650,000
Case  George Thomas v. Jeffrey Mathews, No. 06156/01
Court     Monroe Supreme
Judge     Robert J. Lunn
Date  5/9/2003
Plaintiff
Attorney(s)     Joe Moran, Moran & Kufta, P.C., Rochester, NY
Defense
Attorney(s)     Ernest D. Santoro, Adair, Kaul, Murphy, Axelrod & Santoro, L.L.P., Rochester, NY
Facts & Allegations Plaintiff George Thomas, 40, a mason, was driving his 1985 Nissan pickup truck on eastbound
Ridge Road West, near its intersection with Lake Avenue in Rochester, N.Y. Thomas stopped for a red traffic signal
when he reached the intersection. Moments later, his vehicle was struck from behind by a 1994 Dodge minivan
driven by Jeffrey Matthews.
Thomas sued Matthews, who claimed that the accident occurred because he was distracted by another accident in
the opposite lane. Thomas was granted summary judgment on liability. The trial addressed damages.
Injuries/Damages **herniated** disc at C4-C5; **herniated** disc at C5-C6
Thomas sustained **herniations** at C4-C5 and C5-C6. He underwent an anterior **cervical discectomy** and
**fusion**, with a bone graft and the insertion of a plate and six screws. He claimed that he experiences chronic pain,
range- of-motion limitations in his neck, and an inability to raise his arms above shoulder level.
Result Several months prior to the trial, Thomas demanded the $1.5 million limit of Matthews' insurance policy.
Matthews refused. Four days after the start of the trial, the parties settled for $1.5 million, plus interest of $ 164,935.
Insurer(s)  Amica
Plaintiff
Expert(s) Mary Kysor, nurse practitioner, Geneseo, NY
    Kristine Tebeau, M.D., physical medicine, Geneseo, NY
    Kenneth W. Reagles, Ph.D., vocational rehabilitation/counseling, Syracuse, NY
    Gerald A. Coniglio, orthopedics, Mount Morris, NY
Defense
Expert(s) Michael Vernerelli, economics, Rochester, NY
    Thomas Rick, vocational rehabilitation, Buffalo, NY
    Jay Levy, M.D., orthopedics, Ithaca, NY
  John Hadler

XXII/09-19

PREMISES LIABILITY

Negligent Repair and/or Maintenance   Fire   Ceiling Collapse

Injured fireman claimed improper repairs led to blaze

Verdict (P)     $6,000,000

Case  Theodore Monte v. 88-01, 88-09 35th Ave. Owners Inc. 88-02, 88-10 35th Ave. Owners, Inc. & Queens Mary Ann Corp., No. 13154/98

Court       Queens Supreme

Judge      Orin R. Kitzes

Date  4/16/2004

Plaintiff

Attorney(s)     Vito A. Cannavo, Sullivan, Papain, Block, McGrath & Cannavo P.C., New York, NY

Defense

Attorney(s)     Peter J. Verdirame, Chesney & Murphy LLP, Baldwin, NY

Facts & Allegations On July 23, 1997, plaintiff Theodore Monte, 40, a firefighter, responded to a fire at 88-01 35th Ave. in Queens. Monte was venting an apartment's loft when its ceiling collapsed. He was struck on the head and shoulders and sustained multiple injuries.

Monte sued the building's owners: 88-01, 88-09 35th Ave. Owners Inc.; 88- 02, 88-10 35th Ave. Owners Inc.; and Queens Mary Ann Corp. He claimed that the fire was started by a plumber who was sweating the building's pipes. He alleged that the repairs were improper, and that the plumber was unlicensed.

The defendants initially contended that no such work was performed, but they subsequently conceded liability. The trial addressed damages.

Injuries/Damages **fusion, cervical**; headaches; **herniated** disc at C4-C5; **herniated** disc at C5-C6; **herniated** disc at C6-C7

Monte claimed to have sustained **herniated** discs at C4-5, C5-6 and C6-7. He also claimed that he experienced post-traumatic headaches.

Monte underwent anterior and posterior **cervical**-spine **fusion**, which included an autologous bone graft and insertion of a metallic **fixation** device. He subsequently underwent physical therapy. He has not resumed work. Monte's expert neurologist testified that Monte experiences residual pain and limitations.

The defendants contended that Monte's injuries preexisted the accident. Their expert neurologist opined that Monte made a good recovery.

Result The jury awarded Monte $6 million, but he received $850,000 as a result of an $850,000/$250,000 high/low agreement.

Theodore Monte   $1,200,000 past pain and suffering

$4,800,000 future pain and suffering

$6,000,000

Insurer(s)  Fireman's Fund Insurance Co. for all defendants

Trial Details   Trial Length: 5 days

Jury Deliberations: 1 hour

Jury Poll: 6-0

Jury Composition: 3 male, 3 female

Plaintiff

Expert(s)  Larry Shields, M.D., neurology, Long Beach, NY

Defense

Expert(s)  Raymond H. Coll, M.D., neurology, New York, NY

John Hadler

XXII/13-21
MOTOR VEHICLE
Stop Sign   Intersection
Truck driver ignored stop sign, caused collision
Verdict (P)   $3,480,000
Case  Karen Berg v. United Parcel Service and Robert J. Sagasta, No. 1227/02
Court    Erie Supreme
Judge    John P. Lane
Date  6/30/2004
Plaintiff
Attorney(s)     Gerald W. Schaffer, Cellino & Barnes P.C., Buffalo, NY
Defense
Attorney(s)     Lawrence M. Rubin, Buffalo, NY
Facts & Allegations On June 11, 2001, plaintiff Karen Berg, 39, a waitress, was driving north on Parkhurst
Boulevard, near its intersection with Wrexham Court in Tonawanda. As Berg's vehicle proceeded through the
intersection, it collided with a truck that was being driven by Robert Sagasta, who had entered the intersection via
eastbound Wrexham Court. Berg sustained three **herniated cervical** discs.
Berg sued Sagasta and the owner of Sagasta's vehicle, United Parcel Service of America Inc. Berg alleged that
Sagasta ignored the stop sign that governed his entry to the intersection, and thus, she alleged that he was negligent
in the operation of his truck. She moved for pretrial summary judgment. The defendants opposed the motion. They
contended that Berg was exceeding the speed limit, and that she should have been able to avoid the collision.
Summary judgment was granted. The defendants appealed, but the appellate division, Fourth Department, affirmed,
and the matter proceeded to damages.
Injuries/Damages **fusion, cervical**; **herniated** disc at C4-C5; **herniated** disc at C5-C6; **herniated** disc at
C6-C7
Berg sustained **herniated** discs at C4-5, C5-6 and C6-7. She underwent two surgeries for the creation of **fusion**
at the C4-7 levels. She subsequently underwent physical therapy, chiropractic treatment and massage therapy, which
is ongoing.
Berg has not resumed work. She contended that she experiences residual neck pain.
The defendants contended that Berg is capable of resuming work. They claimed that they conducted periodic
surveillance of Berg's activities, and that the surveillance comprised 10 days dating to 2003. They contended that
Berg never exhibited any indication of pain or limitations during the surveillance. They presented a videotape,
which showed Berg hanging Christmas lights outside of her home.
The defendants also contended that Berg applied for unemployment benefits in December 2001--some three months
prior to her first **fusion** surgery. They claimed that she told the Department of Labor that she was ready, willing
and able to work, and that her doctor had released her for work on Oct. 15, 2001.
Result The jury rendered a plaintiff's verdict. It awarded Berg $3.48 million.
Karen Berg  $725,000 future medical cost
    $35,000 past lost earnings
    $220,000 future lost earnings
    $2,000,000 past pain and suffering
    $500,000 future pain and suffering
    $3,480,000
Demand    $2,500,000
Offer    $500,000
Trial Details   Trial Length: 8 days
    Jury Deliberations: 4 hours
    Jury Composition: 4 male, 2 female
Plaintiff
Expert(s)  Michael J. Vernarelli, economics, Rochester, NY
    Dr. Jeffrey Lewis, neurosurgery, Buffalo, NY (treating surgeon)
    Dr. David Bagnall, pain management, Amherst, NY
    Dr. Romanth Waghmarae, pain management, Buffalo, NY
    Kenneth W. Reagles, Ph.D., vocational rehabilitation/counseling, Syracuse, NY
    Larry Forman, life-care planning, New York, NY
    James Panzarella, M.D., primary-care physician, Tonawanda, NY
    Brian Aldrich, D.C., chiropractic, Tonawanda, NY
Defense

Expert(s)  Dr. Thomas Rick, vocational rehabilitation, Buffalo, NY
    Guy Corkill, M.D., neurosurgery, Redding, CA
Post-Trial The parties reached a settlement. Its terms are confidential.
 John Hadler

XXII/18-17
NEGLIGENT REPAIR
Vehicle fell into ditch dug by gas company
Settlement  $2,300,000
Case  Donald Lawrence and Laura Lawrence v. Hallen Construction Company and Brooklyn Union Gas, No. 6364/96
Court    Queens Supreme
Judge    Martin J. Schulman
Date  8/27/2004
Plaintiff Attorney(s)  Marvin Salenger, Salenger, Sack, Schwartz & Kimmel LLP, New York, NY
     John Zervopoulos, Salenger, Sack, Schwartz & Kimmel LLP, New York, NY
Defense Attorney(s)   Edward Carroll, Cullen and Dykman Bleakley Platt LLP, Brooklyn, NY
Facts & Allegations On Sept. 25, 1995, plaintiff Donald Lawrence, 37, an elevator mechanic, was driving to his house in Queens. When he turned his vehicle to enter his driveway, it fell into a ditch that had been created during a gas-line repair. Lawrence claimed that he sustained two **herniated cervical** discs.
Lawrence sued the gas-line repair's general contractor, Brooklyn Union Gas, and the job's subcontractor, Hallen Construction Co. He alleged that the defendants did not place adequate warnings around the ditch.
Lawrence presented one of his neighbors, who agreed that the warnings were inadequate.
The defendants presented Hallen Construction workers, who testified that the ditch was properly guarded with barriers and cones.
Injuries/Damages **herniated** disc at C5-C6; **herniated** disc at C6-C7; loss of services
Lawrence claimed that he sustained **herniated** discs at C5-6 and C6-7. He underwent surgery and a bone graft. He claimed that he experiences severe neck pain, and that the pain prevents him from resuming work. He also claimed that he experiences limitation of his neck's range of motion.
Lawrence's wife, Laura, presented a loss-of-services claim.
The defendants contended that the accident could not have caused the type of injuries that Lawrence claimed to have sustained. They claimed that the injuries were an aggravation of a preexisting condition, and that Lawrence's chronic smoking was a mitigating factor in his recovery from his surgery. They intended to present post-surgery surveillance videotapes that showed Lawrence helping to remove tree stumps from the front of a neighbor's property.
Result The jury rendered a plaintiff's verdict. It found that the defendants were liable for the accident. During the trial's damages phase, the parties agreed to a $2.3 million settlement, which constituted the limit of Hallen Construction's insurance coverage. Hallen Construction paid the entire settlement, pursuant to an indemnification agreement with Brooklyn Union Gas.
Demand    $1,500,000
Offer     $75,000
Insurer(s)  Reliance Insurance Co. primary insurer for Hallen Construction
     Chubb Insurance Group excess insurer for Hallen Construction
Plaintiff Expert(s)   Lewis Bass, D.O., osteopathy, Ridgewood, NY
     Alan Rosenthal, M.D., neurosurgery, Mineola, NY
 Defense Expert(s)     John A. Desch, P.E., engineering, Riverdale, NJ
     Stephen Gilbert, M.D., neurology, Brooklyn, NY
     Joyce Mesch-Spinello, Ph.D., vocational rehabilitation, New York, NY
     Philip G. Taylor, M.D., orthopedic surgery, Brooklyn, NY
 Amy Bourne

XXIII/23-19
MOTOR VEHICLE
Stop Sign  Broadside  Left Turn  Intersection  Multiple Vehicle
Car crash caused disabling spine injuries, plaintiff alleged
Verdict   $4,300,000
Case  Fredrick Roese v. Country Lincoln Mercury West, LLC, No. 7111/03
Court     Suffolk Supreme
Judge     Thomas F. Whelan
Date  8/22/2005
Plaintiff
Attorney(s)     William D. Wexler, North Babylon, NY
Defense
Attorney(s)     Robert M. Lefland, Thomas M. Bona P.C., White Plains, NY

Facts & Allegations On Dec. 7, 2002, plaintiff Fredrick Roese, 37, a self- employed project manager, was driving on Wading River Road, near its intersection with Brookhaven Avenue, in Suffolk County. As he proceeded through the intersection, his vehicle was struck by a vehicle that was making a left turn onto Wading River Road, from Brookhaven Avenue. He claimed that he sustained back injuries.

Roese sued the vehicle's owner, Country Lincoln Mercury West LLC. He alleged that the vehicle's driver was negligent in his operation of the vehicle and that Country Lincoln Mercury West was vicariously liable for the driver's actions. The driver died prior to the commencement of the suit, so he was not a party.

Roese claimed that the driver ignored the stop sign that governed his entrance to the intersection. He contended that the vehicle suddenly entered the intersection and that, as such, he could not avoid the collision. His counsel moved for pretrial summary judgment of liability. The motion was granted, and the matter proceeded to a bench trial that addressed damages.

Injuries/Damages **diskectomy**; **fusion**, **cervical**; **herniated** disc at C3-4; **herniated** disc at C4-5; physical therapy; plate; reflex sympathetic dystrophy; screws

Roese claimed that he sustained disc **herniations** at C3-4 and C4-5. He underwent surgery that included anterior **discectomies**--excision of the anterior portions of intervertebral discs--**fusion** of his spine's C3, C4 and C5 levels, and the insertion of a **fixation** plate and six screws.

Roese's treating neurologist determined that Roese's **fusion** procedure caused reflex sympathetic dystrophy, a chronic neurological condition that is characterized by severe burning pain, pathological bone and skin changes, excessive sweating, swollen tissue, and increased sensitivity to touch. In Roese's case, it resulted in change to Roese's skin color and caused a clammy skin texture. The neurologist also testified to the numerous prescribed pain medications that Roese is taking, which he opined is the only way Roese can function, and to the unrelenting pain where even the simple touching of Roese's skin on the left arm is unpleasant. He causally related Roese's condition to the accident and testified that Roese cannot work because he has many bad days in which he cannot concentrate because of the chronic pain he experiences. Moreover, the expert contended that the medication that Roese takes makes him tired.

During cross-examination, the neurologist reported that he has been unable to reduce the medication because of Roese's continued pain and that he might have to increase the dosage. He further opined that Roese could not work because of the loss of executive function and the fact that Roese is not always cognitively intact.

Roese's expert orthopedic spine surgeon, who performed the **diskectomy** and **fusion**, testified that Roese underwent physical therapy, injections into the ganglion blocks where the sympathetic nerves reside, and a myelogram into the spine. He further testified that Roese's injuries were traumatically caused and permanent, and that he should not perform any heavy lifting, particularly with the use of his medication.

Roese's economic expert testified that Roese's future lost wages would total $3,014,603. He arrived at the figure by factoring a 3.5% annual wage increase to a static, no-growth approach to Roese's business venture. The expert also calculated a loss in Social Security retirement income of $307, 126, based upon a maximum work history, until the year 2032, at age 67.

Roese claimed that he suffers constant, daily shooting pain and burning sensation in his limbs. He claimed that the accident has caused dramatic changes in his life, including his inability to be a drummer, to play sports, to snowmobile, and to hunt turtles and snakes with his nephew. He also contended that it limits his ability to sit for long periods of time. He claimed that he can no longer return to his prior active lifestyle, that he is limited to performing simple tasks, that he has required narcotic painkillers ever since shortly after the accident and that he will suffer unrelenting pain for the remainder of his life. He contended that he was forced to sell his collection of rock 'n roll memorabilia and his drum sets to help "make ends meet."

Roese sought recovery of his future lost wages and damages for his past and future pain and suffering.

Defense counsel contended that Roese did not sustain a serious injury, as defined by the no-fault law, Insurance Law § 5102(d).

The defense's pain-management expert, who examined Roese on Feb. 10, 2004, opined that Roese was exaggerating his symptoms and that he could perform his activities of daily living. She further opined that Roese was capable of taking care of himself without the need for special transportation or household help. During cross-examination, the expert conceded that she did not have any of Roese's medical records, tests, films or reports at the time of her examination.

Result Judge Thomas Whelan found that Roese sustained a serious injury. Roese was awarded $4.3 million.

Fredrick Roese   $2,200,000 future lost earnings
    $600,000 past pain and suffering
    $1,500,000 future pain and suffering
    $4,300,000

Demand   None
Offer   $1,000,000
Insurer(s)  Universal Underwriters Insurance Co.
Trial Details   Trial Length: 3 days
Plaintiff
Expert(s)  John Labiak, M.D., orthopedic surgery, Smithtown, NY
    Alan M. Leiken, Ph.D., lost earnings (economics), East Setauket, NY
    Frederic A. Mendelsohn, neurology, Holbrook, NY
Defense
Expert(s)  Anna Krol, pain management, Brooklyn, NY
 Jacqueline Linger

XXIII/36-23
MOTOR VEHICLE
Intersection   Multiple Vehicle
Plaintiff claimed his car was dragged by tractor-trailer
Settlement  $1,700,000
Case  David Lopez v. Delaware Valley Shippers Inc. and Mark Sonnie, No. CV 04 0792
Court      U.S. District Court, Eastern District
Judge      Charles P. Sifton
Date  1/12/2006
Plaintiff Attorney(s)    Shaun K. Hogan, Lefkowitz, Louis, Sullivan & Hogan, LLP, Jericho, NY
    James J. McCrorie, Law Office of James J. McCrorie, New York, NY
Defense Attorney(s)    Douglas W. Rennie, Montgomery, Rennie & Jonson, Cincinnati, OH
    Robert Spiveck, trial counsel to Jeffrey Samel & Partners, New York, NY
Facts & Allegations On July 2, 2003, plaintiff David Lopez, 46, a salesman, was stopped in traffic on the Van Wyck Expressway's service road, at the intersection with Atlantic Avenue, in Queens. A tractor-trailer being operated by Marc Sonnie attempted to make a left turn onto Atlantic Avenue. Lopez claimed that the tractor-trailer hooked onto the rear of his vehicle and dragged it into a third vehicle. Lopez claimed that he sustained neck injuries.

Lopez sued Sonnie and Sonnie's employer, Delaware Valley Shippers Inc. He alleged that Sonnie was negligent in the operation of his vehicle and that Delaware Valley Shippers was liable because the collision occurred within the scope of Sonnie's work duties.

Lopez testified that he was struck and dragged by the defendants' tractor-trailer, causing him to be tossed about the inside of his vehicle upon impact with a third vehicle that was also stopped in traffic.

Sonnie contended that his tractor-trailer never contacted or dragged Lopez' s vehicle.

Injuries/Damages facetectomy; **herniated** disc at C3-4; **herniated** disc at C4- 5; **herniated** disc at C5-6; **herniated** disc at C6-7; laminotomy; micro**diskectomy**; physical therapy

Lopez refused medical attention at the scene and did not seek treatment of his neck injury until eight days after the accident. He sought initial treatment with a chiropractor, and he underwent an MRI, which revealed disc **herniations** from C3-4 through C6-7. He claimed that the **herniations** were a result of the collision. He underwent pain-management therapy and physical therapy.

About a year and a half after the accident, Lopez underwent a micro- **discectomy**, a laminotomy and a facetectomy from C3-4 through C6-7. He subsequently underwent six months of weekly physical therapy.

Lopez's supervisor testified that upon Lopez's return to work on the date of the accident, he made complaints of neck pain, which were noted on the employer's accident report.

Lopez claimed that he experiences pain and discomfort and that he never returned to work after the accident. He was receiving workers' compensation benefits at the time of the trial. He sought recovery of damages for his past and future pain and suffering.

Defense counsel contended that Lopez's injuries preexisted the accident and that the impact was too minor to have caused or aggravated the injuries.

Result During the fourth day of the unified trial, the parties agreed to a $ 1.7 million settlement.
Demand    $2,000,000
Offer      $650,000
Plaintiff Expert(s)  Richard Radna, neurosurgery, New York, NY
Defense Expert(s)  Dr. Roger A. Bonomo, neurology, New York, NY
Editor's Note Sonnie's counsel did not respond to a faxed draft of this report and a phone call.
  Jacqueline Linger

XXIV/14-09
PREMISES LIABILITY
Dangerous Condition   Elevator Accidents   Workplace   Labor Law   Slips, Trips & Falls   Fall from Height
Open elevator shaft a hazard, mover claimed
Mediated Settlement   $2,500,000
Case   Carlos Torres v. Carlos Atelier Alex Atelier, Carlos & Alex Atelier Co., Yorkshire Properties, Inc., Formerly
Known as Wilmington Property Associates, Inc., Sol Pacht, Harold Pacht and Jeanette S. Post, No. 19644/03
Court       Kings Supreme
Neutral(s)       Michael McAllister, JAMS
Date   6/30/2006
Plaintiff Attorney(s)   Elliot Gold, Borda, Kennedy, Alsen and Gold, LLP, Bay Shore, NY
Defense Attorney(s)   Michael F. Grady, Rende, Ryan & Downes, L.L.P, White Plains, NY (Carlos Alex Atelier Co.)
       Neil Veilleux, PIllinger, Miller, Tarallo, LLP, Elmsford, NY ( Yorkshire Properties Inc.)
       None reported (Harold Pacht, Jeanette S. Post, Sol Pacht)
Facts & Allegations On July 26, 2002, plaintiff Carlos Torres, 37, a mover, worked at a building that was located at
100-10 91st Ave., in the Brooklyn Manor section of Queens. While standing on a loading dock, moving a 400-
pound armoire, he stepped backward and fell into the open shaft of a freight elevator. He fell about 8 feet and
sustained injuries of his neck. Torres sued the building's owner, Yorkshire Properties Inc.; a commercial tenant,
Carlos Alex Atelier Co.; that company's owners, Alex and Carlos Atelier; and the building's previous owners,
Harold Pacht, Sol Pacht and Jeanette Post. Torres alleged that the open elevator shaft constituted a dangerous
condition. Torres subsequently discontinued his claims against Post, Harold Pacht and Sol Pacht. The matter
proceeded against the remaining defendants. Torres claimed that a piece of cardboard was placed in the elevator's
control-panel switch to prevent the safety gate from automatically closing, thereby making it obsolete. His counsel
argued that Yorkshire Properties was liable as an out-of-possession landlord, pursuant to Labor Law §§ 255 and 316.
Plaintiff's counsel also claimed that the open elevator shaft constituted violations of Industrial Code §§ 8-1.1 and 8-
1.6. He argued that notice was not necessary because the building was a tenant-factory building. Yorkshire
Properties contended that, about six weeks prior to the accident, it leased the premises to Carlos Alex Atelier Co.,
which had sole and exclusive possession of its portion of the premises and the freight elevator. Yorkshire Properties'
counsel argued that, as the out-of- possession landlord, the company had no notice of the condition and had no
control or supervision over the work that was being performed. Carlos Alex Atelier Co. acknowledged that it was
the only party with access to the elevator. However, it contended that it did not create the dangerous condition.
Injuries/Damages **arthrodesis**; corpectomy; **discectomy**; foraminotomy; **herniated** disc at C3-4; **herniated**
disc at C4-5; **herniated** disc at C5-6; internal **fixation**
One day after the accident, Torres presented to Southside Hospital, in Bay Shore. Doctors determined that he was
suffering disc **herniations** at C3-4, C4-5 and C5-6. Several weeks later, he underwent a **diskectomy**--the
excision of an intervertebral disc. The procedure addressed his C5-6 and C6-7 discs, and it also included the
application of an allograft; performance of an **arthrodesis**, which is the immobilization or stiffening of a joint; a
C5-6 corpectomy, which is the removal of a portion of the C5 and C6 vertebrae; and a C6-7 foraminotomy, which is
a minimally invasive procedure that enlarges the space that is occupied by the spine's nerve roots at C6 and C7.
About one year later, Torres underwent a C3-4 **diskectomy**, after the screws that were originally inserted shifted.
He attempted to return to work twice at his moving company in a sedentary capacity, but he was unable to continue.
Torres sought recovery of his past and future lost wages and damages for his past and future pain and suffering.
Defense counsel contended that Torres recovered well.
Result The parties agreed to a $2.5 million pretrial settlement, which was established via the guidance of mediator
Michael McAllister. Carlos Alex Atelier Co.'s insurer agreed to contribute $1 million, and Yorkshire Properties'
insurers agreed to contribute a total of $1.5 million.
Insurer(s)       Greenwich Insurance Co. for Yorkshire Properties (primary insurer)
       Zurich North America for Yorkshire Properties (excess)
       St. Paul Travelers Inc. for Carlos Alex Atelier
Editor's Note VerdictSearch did not solicit feedback from counsel for Post, Harold Pacht and Sol Pacht. The
remaining defense attorneys did not respond to faxed drafts of this report and phone calls.
 Peter Hayes

XXV/37-12
MOTOR VEHICLE
Rear-ender  Multiple Vehicle
Car crash aggravated neck injuries, plaintiff alleged
Mediated Settlement   $3,000,000
Case  Ellen Goodman and Jonathan Goodman v. Financial Services Vehicle Trust, Julia Hananel and Eric Hananel, No. 110574/05
Court    New York Supreme
Neutral(s)    Michael McAllister
Date  1/2/2008
Plaintiff Attorney(s)  Stephen H. Frankel, Law Office of Stephen H. Frankel, Woodbury, NY
Defense Attorney(s)   Dominic Bianco, Gallagher, Walker, Bianco & Plastaras L.L.P., Mineola, NY (Financial Services Vehicle Trust)
      Paul Cohen, Epstein & McDonald, New York, NY (Eric Hananel, Julia Hananel)
Facts & Allegations On Jan. 13, 2005, plaintiff Ellen Goodman, 48, a teacher, was driving on Warren Avenue, near its intersection at Jefferson Street, in Roslyn. When she reached the intersection, she stopped. Before she could resume travel, her vehicle's rear end was struck by a trailing vehicle that was being driven by Julia Hananel. Goodman claimed that she sustained an injury of her neck.
Goodman sued Hananel; the registered owner of Hananel's vehicle, Eric Hananel; and the vehicle's lessor, Financial Services Vehicle Trust. Goodman alleged that Julia Hananel was negligent in the operation of her vehicle. She further alleged that the remaining defendants were vicariously liable for Hananel's actions.
Injuries/Damages aggravation of preexisting condition; bone graft; **diskectomy**; **fusion, cervical**; internal **fixation**; psychiatric impairment

Goodman claimed that the accident aggravated **herniations** of **cervical** intervertebral discs. In July 2005, she underwent revision of prior **fusions** of her spine's C4, C5 and C6 levels. The surgery also included a **diskectomy**, which is the excision of an intervertebral disc, a new **fusion**, the implantation of **fixation hardware**, and the application of a bone allograft at C6-7.
Goodman contended that she experiences constant, daily pain and that she is clinically depressed because of her inability to work. She claimed that she will have to undergo physical therapy and psychiatric treatment.
Goodman stopped working in March 2005, pursuant to the recommendation of her physiatrist. She ultimately qualified for Social Security disability benefits.
Goodman sought recovery of $2.5 million for her future medical expenses, a total of $3.7 million for her future lost earnings and benefits, and damages for her past and future pain and suffering.
Goodman's husband claimed that he must perform many of his wife's usual daily tasks. He sought recovery of damages for his loss of services.
Defense counsel contended that Ms. Goodman would have required surgery at C6-7 regardless of the accident and that all of her injuries preexisted the accident. They argued that the impact was minor, given that there was minimal damage to both cars, and that the accident could not have caused Goodman's injuries.
Result Plaintiffs' counsel moved for pretrial summary judgment of liability. The motion was granted in December 2006, but defense counsel appealed. During pendency of the appeal, the parties agreed to a $3 million settlement, which was established via the guidance of mediator Michael McAllister, of JAMS. Financial Services Vehicle Trust's insurer agreed to contribute $2.5 million, and the remaining defendants' insurer agreed to contribute $500,000.
Insurer(s)  Chubb Group of Insurance Cos. for Financial Services Vehicle Trust
      Nationwide Mutual Insurance Co. for Eric Hananel and Julia Hananel
Plaintiff Expert(s)   Anthony Donatelli, M.D., psychiatry, Manhasset, NY
      Stephen Geiger, M.D., physical medicine, Uniondale, NY (treating physiatrist)
      Alan M. Leiken, Ph.D., economics, Stony Brook, NY
      Andrew Sama, M.D., orthopedics, Manhasset, NY
Defense Expert(s)   Mauro Cataletto, M.D., orthopedics, Mineola, NY
      William Head, M.D., psychiatry, Union, NJ
      Wilhelmina Korevaar, M.D., pain management, Bala Cynwyd, PA
      Steven L. Mendelsohn, M.D., radiology, Lindenhurst, NY
      Joyce Mesch-Spinello, Ph.D, vocational rehabilitation, New York, NY
Editor's Note This report is based on information that was provided by plaintiffs' counsel. Defense counsel did not respond to the reporter's phone calls.
 Nancy Deluca

XXVII/05-27
MOTOR VEHICLE
No-Fault Case   Rear-ender   Multiple Vehicle   Civil Practice   Summary Judgment
Car crash caused spinal injuries, atrophy, plaintiff alleged
Verdict   $1,400,000
Actual    $300,000
Case  Steven A. Blackmon v. Shelby M. Fabiano and Dean J. Fabiano, No. 506/08
Court     Ulster Supreme
Judge     Richard M. Platkin
Date  6/11/2009
Plaintiff Attorney(s)  Joseph E. O'Connor, Mainetti, Mainetti & O'Connor, P.C., Kingston, NY
Defense Attorney(s)    Paul A. Hurley, Boeggeman, George & Corde, P.C., Albany, NY
Facts & Allegations On Oct. 8, 2007, plaintiff Steven Blackmon, 36, a dance instructor, was driving on Route 9W, in Saugerties. His vehicle's rear end was struck by a trailing vehicle that was being driven by Dean Fabiano. Blackmon claimed that he sustained an injury of his neck.

Blackmon sued Fabiano and the owner of Fabiano's vehicle, Shelby Fabiano. Blackmon alleged that Dean Fabiano was negligent in the operation of his vehicle. Blackmon further alleged that Shelby Fabiano was vicariously liable for Dean Fabiano's actions.

Blackmon claimed that the collision occurred while he was stopped, waiting to execute a left turn onto the premises of a gasoline station. He contended that Dean Fabiano was maintaining a speed of 30 to 40 mph.

Fabiano contended that Blackmon did not signal his turn and that Blackmon's vehicle's brake lights were not illuminated. He claimed that when he realized that his vehicle was nearing Blackmon's vehicle, he took evasive actions, but that he was not able to avoid the collision.

Blackmon's counsel moved for summary judgment of liability, and the motion was granted. The trial addressed damages.

Injuries/Damages decreased range of motion; **diskectomy**; **fusion**, **cervical**; **herniated** disc at C5-6; **herniated** disc at C6-7; **herniated** disc at C7-T1; physical therapy; radiculopathy

Blackmon claimed that he sustained **herniations** of his C5-6, C6-7 and C7-T1 intervertebral discs. He also claimed that he suffered radiculopathy that stemmed from his spine's C7 level. He initially underwent physical therapy, but his injuries ultimately necessitated surgery that included a **diskectomy**, which is the excision of a disc, and **fusion** of the associated area of his spine. The surgery was followed by additional physical therapy. Blackmon contended that he suffers residual atrophy of his entire upper extremity. He also contended that he suffers residual pain and a residual reduction of his neck's range of motion. He acknowledged that he was able to resume work, but he claimed that he worked merely three hours a week for about eight months. He also claimed that he can no longer instruct dance, though he can choreograph dance routines. Blackmon acknowledged that he is able to jog and exercise, but he contended that his injuries prevent his resumption of the weight-lifting exercise that he previously enjoyed.

Blackmon sought recovery of $200,000 for his past pain and suffering and an unspecified amount for his future pain and suffering.

Defense counsel contended that Blackmon's injuries stemmed from degenerative conditions that antedated the accident. He claimed that an MRI scan, performed several weeks after the accident, revealed degenerative changes of the **cervical** region of Blackmon's spine. He also claimed that radicular symptoms were not found during Blackmon's first post-accident medical examination. As such, he argued that there was no objective evidence of an acute, trauma-induced **herniation**.

The defense's expert neurologist agreed that Blackmon's complaints were related to a degenerative disc disease, and he opined that the accident produced nothing more than a mild sprain of Blackmon's neck. Thus, defense counsel contended that Blackmon did not sustain a serious injury, as defined by the no-fault law, Insurance Law § 5102(d). During the trial, the parties negotiated a $300,000/$60,000 high/low agreement.

Result The jury found that Blackmon sustained a serious injury. It determined that Blackmon's damages totaled $1.4 million, but Blackmon's recovery was reduced to the high/low agreement's $300,000 maximum amount.
Steven Blackmon  $200,000 past pain and suffering
    $1,200,000 future pain and suffering
    $1,400,000
Demand    $300,000
Offer     $50,000
Insurer(s)  New York Central Mutual Fire Insurance Co. for both defendants
Trial Details   Trial Length: 4 days
    Jury Deliberations: 1.5 hours

Jury Vote: 6-0
Jury Composition: 1 male, 5 female
Plaintiff Expert(s)    Paul Spurgas, M.D., neurosurgery, Albany, NY ( treating doctor)
Michael I. Weintraub, M.D., neurology, Briarcliff Manor, NY
Defense Expert(s)     Christopher Calder, M.D., neurology, Albany, NY
Editor's Note This report is based on information that was provided by plaintiff's and defense counsel.
Tim Heinz

XXVIII/42-19
PREMISES LIABILITY
Negligent Repair and/or Maintenance   Dangerous Condition   Trip and Fall Stairs or Stairway   Office Building
Alternative Dispute Resolution Mediation
Building's landlord ignored damaged stairway, suit alleged
Mediated Settlement   $3,900,000
Case  Patricia Page & James Page v. Ulrich Development Co. & 111 Main Street, LLC, No. 124728/08
Court     Niagara Supreme
Judge     Ralph A. Boniello III
Neutral(s)     Sharon Stern Gerstman
Date 3/11/2011
Plaintiff Attorney(s)  Thomas M. Mercure, Lipsitz Green Scime Cambria LLP, Buffalo, NY
    Scott M. Schwartz, Lipsitz Green Scime Cambria LLP, Buffalo, NY
Defense Attorney(s)    Brian P. Crosby, Gibson, McAskill & Crosby, LLP, Buffalo, NY (Niagara County)
    Mary Q. Wydysh, Bouvier, O'Connor, Buffalo, NY (111 Main Street, LLC)
    None reported (Ulrich Development Co.)
Facts & Allegations On June 9, 2005, plaintiff Patricia Page, 50, a county's elections clerk, tripped while she was descending a stairway of her place of employment, an office building that was located at 111 Main St., in Lockport. She fell down some 11 steps, and she claimed that she sustained injuries of her neck.
Page sued two entities that were believed to be owners of the premises, Ulrich Development Co. and 111 Main Street, LLC. She alleged that the defendants were negligent in their maintenance of the premises. She further alleged that the defendants' negligence created a dangerous condition.
The defendants impleaded Page's employer, Niagara County. The direct defendants sought indemnification. However, the third-party claim was severed and ultimately dismissed. Page's counsel discontinued the claim against Ulrich Development, and the matter proceeded to a trial against 111 Main Street.
Page claimed that she tripped on the stairway's top step. She contended that the step was missing a chunk of the rubber molding that covered the edges of each step. She and several of her co-workers agreed that the defect had formed several months prior to the accident. As such, Page's counsel argued that 111 Main Street had constructive notice of the defect.
Defense counsel contended that Page could not prove that her accident was caused by a defect of the stairway.
Injuries/Damages diminished cognitive ability; **diskectomy**; **herniated** disc at C4-5; **herniated** disc at C5-6
Page claimed that she sustained **herniations** of her C4-5 and C5-6 intervertebral discs. She initially underwent about 38 months of conservative treatment, but she ultimately underwent a **diskectomy**, which involved the excision of her **herniated** discs. Page contended that the surgery was not properly performed, and she claimed that the surgeon's errors caused damage that led to permanent impairment of her cognitive functions. She also claimed that she cannot easily walk and that she tires easily.
Page's treating surgeon opined that Page's surgery was necessitated by trauma that occurred during the accident. Page's treating neurologist, treating neuropsychologist and treating psychologist agreed that her cognitive impairment is a permanent result of the surgery that she underwent.
Page claimed that she suffers permanent residual pain. She contended that her pain and cognitive impairment permanently prevent her resumption of her job. She sought recovery of her past medical expenses, her past and future lost earnings, and damages for her past and future pain and suffering. Her husband sought recovery of damages for his loss of services.
The defense's expert orthopedic surgeon opined that Ms. Page's **herniations** formed prior to the accident.
Result The parties negotiated a pretrial settlement, which was finalized via the guidance of special referee Sharon Stern Gerstman. The insurer of 111 Main Street agreed to pay $3.9 million, from a policy that provided $4 million of coverage.
Insurer(s)  Peerless Insurance Co. for 111 Main Street
Plaintiff Expert(s)   George C. Kalonaros, M.D., neurology, Buffalo, NY ( treating doctor; did not testify)
    Christopher Pino, Ph.D., psychology/counseling, Buffalo, NY (treating doctor; did not testify)
    Michael P. Santa Maria, Ph.D., neuropsychology, Niagara Falls, NY ( treating doctor; did not testify)
    Franco Vigna, M.D., orthopedic surgery, Niagara Falls, NY (treating doctor; did not testify)
Defense Expert(s)    Robert M. Lifeso, M.D., orthopedic surgery, Buffalo, NY (did not testify)
Editor's Note This report is based on information that was provided by plaintiff's counsel. Ulrich Development's counsel was not asked to contribute; Niagara County's counsel declined to contribute; and 111 Main Street's counsel did not respond to the reporter's phone calls.
 Asher Hawkins

XXIX/16-21
MOTOR VEHICLE
No-Fault Case  Lane Change  Sideswipe  Multiple Vehicle
Car crash caused spinal injuries, claimant alleged
Verdict   $2,233,288
Case  Patricia Anderson v. The State of New York, No. 116312
Court      Court of Claims, Albany
Judge      Faviola A. Soto
Date 6/23/2011
Plaintiff Attorney(s)  Walter F. Benson, Of Counsel, Alan J. Stern, P.C., Syracuse, NY
    Alan J. Stern, Alan J. Stern, P.C., Garden City, NY
Defense Attorney(s)   Robert Schwerdt, Assistant Attorney General, New York, NY

Facts & Allegations On May 22, 2008, claimant Patricia Anderson, a 45-year- old unemployed woman, was driving south along Merrick Boulevard, near its intersection with Archer Avenue, in the Jamaica sectiion of Queens. The driver's side of her vehicle collided with the passenger side of a vehicle that was owned by the state of New York and being driven southbound along Merrick Boulevard by Omar Hunter. Anderson sustained injuries of her back and neck.

Anderson sued the state of New York. She alleged that Hunter was negligent in the operation of his vehicle. She further alleged that the state was vicariously liable for Hunter's actions.

Anderson contended that Hunter attempted to pass her from the left along the one-way street and caused the accident. She claimed that photographs of the vehicles taken after the accident indicated that Hunter attempted to pass her from the left.

Hunter contended that Anderson caused the accident and argued that Anderson moved over into the passenger's side of his vehicle.

Injuries/Damages acupuncture; arm; bulging disc, **cervical**; bulging disc, lumbar; decompression surgery; decreased range of motion; **diskectomy**; **fusion**, **cervical**; **herniated** disc at C4-5; **herniated** disc at C5-6; lordosis; nerve impingement; numbness; physical therapy; radiculopathy; shoulder; trigger point injection

Anderson claimed that she suffered bulges of her C3-4, L4-5 and L5-S1 intervertebral discs and **herniations** of her C4-5 and C5-6 discs, which were found to impinge on nerve roots and the thecal sac. She was placed in an ambulance, and she was transported to a hospital, where she complained of left shoulder pain. She was treated with pained medication and released.

On May 28, 2008, Anderson presented to another hospital with complaints of pain in her neck and back. X-rays of the back and spine did not show abnormalities. Soon thereafter, she was diagnosed with the bulges and **herniations**.

Anderson then underwent more than 50 injections and physical therapy sessions two to three times a week for one year. She continued to complain of pain, and, on June 29, 2010, her neurosurgeon performed an anterior **cervical diskectomy** and decompression at C4-5 and C5-6, with an anterior **cervical fusion** that included the placement of a bio-medical device. Anderson also underwent acupuncture.

Anderson claimed that the injuries resulted in numbness and burning in her left arm, traumatic pain syndrome, a disruption of her spine's normal lordosis and a loss of 10 percent of movement in her lumbar spine. She claimed that she suffered a loss of enjoyment of life as she was unable to reach the cupboard, cook, make her bed, perform tasks of daily living or lift her infant grandson. Anderson's friend testified that Anderson could not do laundry, lift a pot or pour orange juice.

Anderson continued to treat with pain medication and psychological treatments through the time of trial and was recommended for future treatments that include another surgical procedure; 30 physical therapy sessions, 12 to 18 trigger point injections yearly; MRI scans, electromyographies and pain medication.

Anderson's treating physician opined that the injuries were the result of the accident, that Anderson suffered significant limitation and that she will need future treatment.

Anderson's expert neurologist found that the injuries were the result of the accident. He also reported that he found tenderness in the neck, spasms, a significant limitation in Anderson's range of motion, radiculopathy and atrophy in the left arm. He further opined that the injuries were permanent and that Anderson will require future surgery.

Anderson sought recovery of her past and future medical expenses and damages for her past and future pain and suffering.

Defense counsel contended that Anderson did not sustain a serious injury, as defined by the no-fault law, Insurance Law § 5102(d).

The state's radiology expert opined that, based on medical records and films, there was no sign of an acute injury, though he reported finding a small **herniation** at C4-5 and a mild bulge at C3-4, which he asserted was evidence of chronic degenerative disc disease. He also reported that he found no impingement and only degeneration that was normal and consistent with age that became symptomatic after trauma.

The state's expert orthopedist reported that he found that Anderson walked normally and that he saw no indication of limitation, tenderness, atrophy, or loss of range of motion or strength. He also reported no impingement but admitted that he found radiculopathy, which had resolved. He opined that she needed no further treatment and was not disabled.

Result Judge Faviola Soto found that Anderson sustained a serious injury. She determined that Anderson's damages totaled $2,233,288.

Patricia Anderson     $2,288 past medical cost
   $631,000 future medical cost
   $250,000 past pain and suffering
   $1,350,000 future pain and suffering
   $2,233,288

Plaintiff Expert(s)   Kaushik Das, M.D., neurosurgery, New York, NY ( treating doctor)
   Ali E. Guy, M.D., physical rehabilitation, New York, NY (treating doctor)

Defense Expert(s)     Michael Carlin, M.D., radiology, Flushing, NY
   Michael J. Katz, M.D., orthopedics, Forest Hills, NY
   James B. Sarno, M.D., neurology, Hempstead, NY

Editor's Note This report is based on information that was provided by claimant's counsel. Defense counsel did not respond to the reporter's phone calls.

 Max Mitchell

XXIX/20-13
MOTOR VEHICLE
Red Light  Intersection  Broadside  Multiple Vehicle  Alternative Dispute Resolution  Mediation
Motorist drove through red light, caused crash, plaintiff alleged
Mediated Settlement   $1,700,000
Case  Bruce E. Sandy v. East Hills Chrysler Jeep Dodge and Leslie Shuman, No. 9525/07
Court     Queens Supreme
Judge     Robert L. Nahman
Neutral(s)   John P. DiBlasi
Date  10/3/2011
Plaintiff Attorney(s) H.Q. Nguyen, New York, NY, trial counsel, Elliot Ifraimoff & Associates, Forest Hills, NY
    Michael A. Stea, Queens, NY, trial counsel, Elliot Ifraimoff & Associates, Forest Hills, NY
Defense Attorney(s)   Lauren A. Alfano-Moshos, Helwig Henderson Ryan & Spinola, LLP, Carle Place, NY (Leslie
Shuman)
    Thomas B. Goren, Morenus, Conway, Goren & Brandman, Melville, NY ( East Hills Chrysler Jeep and Dodge)
Facts & Allegations On Oct. 13, 2006, plaintiff Bruce Sandy, a 53-year-old unemployed man, was driving in
Manhasset. While he was proceeding through the intersection of Community Drive and Community Drive East, his
sport utility vehicle collided with a sport utility vehicle that was being driven by Leslie Shuman. Sandy claimed that
he sustained injuries of his back and neck.
Sandy sued Shuman and the owner of Shuman's vehicle, East Hills Chrysler Jeep and Dodge. Sandy alleged that
Shuman was negligent in the operation of her vehicle. Sandy further alleged that East Hills Chrysler Jeep and Dodge
was vicariously liable for Shuman's actions.
According to Sandy, the accident occurred as he was proceeding through the intersection with a green light in his
favor. He contended that Shuman caused the accident by running a red light.
Shuman responded that she was stopped at the red light when a vehicle approached from behind at a great rate of
speed, leaving her no choice but to run the red light and enter the intersection. However, witnesses who were
standing in a nearby parking lot stated that there was no speeding car behind Shuman when the accident occurred.
East Hills Chrysler supported Shuman's contention that Sandy was at fault with respect to the accident.
Injuries/Damages aggravation of pre-existing condition; arthroscopy; decreased range of motion; **diskectomy**;
**fusion**, **cervical**; **herniated** disc at C5-6; **herniated** disc at C6-7; **laminectomy**; radiculopathy; shoulder
impingement; torn rotator cuff
Immediately after the accident, Sandy sought medical treatment for neck and back pain.
Sandy had an extensive history of medical problems. He stopped working following a 1992 diagnosis of sarcoidosis.
In May 2006, about five months before the instant accident, a longstanding spinal stenosis condition culminated
with Sandy's undergoing an operation that included decompression at the L5 level, bilateral **fusion** at L5-S1, and
posterolateral and interbody **fusion** at L5-S1. In addition, his treating physicians informed Sandy at that time that
he would require a **cervical diskectomy** and **fusion** at the C5 through C7 levels.
Following his accident with Shuman, Sandy was diagnosed as suffering impingement and a torn rotator cuff in his
right, dominant shoulder; **herniated** discs at the C5 through C7 levels; and post-traumatic radiculopathy centered
around the L4-5 level.
Arthroscopic surgery was performed on Sandy's right shoulder in May 2007. In May 2009, he underwent an anterior
**cervical diskectomy** and **fusion** at the C5 through C7 levels. In May 2010 he had a revision lumbar
**laminectomy** performed at the L4 through S1 levels.
Sandy claimed that the accident caused him to suffer decreased range of motion in his right shoulder and new
sensations of pain in his neck and lower back that were distinct from those he experienced prior to the accident. His
various injuries have resulted in significant difficulties in performing typical daily activities, according to Sandy.
Sandy's treating spinal surgeons concluded that the trauma of the collision with Shuman exacerbated Sandy's pre-
existing neck and back conditions in such a manner that the subsequent surgeries were medically necessary.
An expert in life-care planning retained by plaintiff's counsel determined that Sandy would need regular physical
therapy and medication for the remainder of his life, and that his future medical costs would total an estimated $3.37
million.
The defense retained experts in neurology, orthopedic surgery and radiology, who opined that the injuries Sandy
attributed to the instant crash in fact stemmed from his pre-existing degenerative conditions and that the surgeries
Sandy underwent from 2007 to 2010 would have been necessary notwithstanding the October 2006 auto accident.
Result About a week before jury selection was expected to commence, the parties submitted to mediation before
John DiBlasi, of National Arbitration and Mediation Inc. DiBlasi called attention to Sandy's complicated medical
history prior to the accident but also stressed that medical records following his May 2006 spinal surgery indicated
that Sandy was recovering well.

The parties reached a settlement agreement that will see East Hills Chrysler's insurer pay Sandy $1.6 million from policies with combined coverage totaling $20 million, while Shuman's insurer will tender the $100,000 coverage limits of the auto collision policy under which she was insured at the time.

Insurer(s)  Zurich North America for East Hills Chrysler Jeep and Dodge
    USAA for Shuman

Plaintiff Expert(s)    Frank P. Cammisa, M.D., spinal surgery, New York, NY (treating doctor; did not testify)
    Joseph Gregorace, D.O., pain management, Bellmore, NY (treating doctor; did not testify)
    Richard Obedian, M.D., orthopedic surgery, Hicksville, NY (treating doctor; did not testify)
    Barry Root, M.D., life-care planning, Glen Cove, NY (did not testify)

Defense Expert(s)    Daniel J. Feuer, M.D., neurology, Astoria, NY (did not testify)
    Steven L. Mendelsohn, M.D., radiology, Lindenhurst, NY (did not testify)
    Leon Sultan, M.D., orthopedic surgery, Forest Hills, NY (Did not testify)

Editor's Note This report is based on information that was provided by plaintiff's counsel and counsel of East Hills Chrysler Jeep and Dodge. Shuman's counsel did not respond to the reporter's phone calls.

 Asher Hawkins

XXIX/26-09
MOTOR VEHICLE
Rear-ender  Multiple Vehicle  Civil Practice  Summary Judgment Alternative Dispute Resolution  Arbitration
Expressway accident caused spinal injuries, plaintiff claimed
Arbitration     $2,400,000
Case  Waichau Tsang v. Dominic DiVito and Michael Inzone, No. 1177/10
Court     Queens Supreme
Neutral(s)     John DiBlasi
Date  11/16/2011
Plaintiff Attorney(s)  Daniel P. O'Toole (lead), Block O'Toole & Murphy, LLP, New York, NY
    Frederick C. Aranki, Block O'Toole & Murphy, LLP, New York, NY
Defense Attorney(s)   Michele A. Musarra, Epstein, Frankini & Grammatico, Woodbury, NY
Facts & Allegations On July 30, 2009, plaintiff Waichau Tsang, 41, a customer-service representative, was driving on the Long Island Expressway, in the Pomonok section of Queens. His vehicle's rear end was struck by a trailing vehicle that was being driven by Dominic DiVito. Tsang claimed that he sustained injuries of his neck.
Tsang sued DiVito and the owner of DiVito's vehicle, Michael Inzone. Tsang alleged that DiVito was negligent in the operation of his vehicle. Tsang further alleged that Inzone was vicariously liable for DiVito's actions.
Liability was decided via summary judgment. The matter proceeded to an arbitration that addressed damages.
Injuries/Damages **diskectomy**; epidural injections; **fusion, cervical**; **hardware** implanted; **herniated** disc at C2-3; **herniated** disc at C3-4; **herniated** disc at C4-5; **herniated** disc at C5-6; **herniated** disc at C6-7; physical therapy; steroid injection
Tsang claimed that he sustained **herniations** of his C2-3, C3-4, C4-5, C5-6 and C6-7 intervertebral discs. He initially underwent conservative treatment that included physical therapy that was typically rendered two to three times a week; the administration of three injections of steroid- based painkillers, which were directed to his neck; and the administration of epidural injections of steroid-based painkillers, which were directed to his back. However, he claimed that the treatment did not relieve his pain.
On May 18, 2010, Tsang underwent surgery that included a **diskectomy**, which involved the excision of his C5-6 disc, **fusion** of the corresponding area of his spine and the implantation of stabilizing **hardware**. The surgery was followed by additional physical therapy, which is ongoing.
Tsang contended that he suffers residual pain that prevents his resumption of work. Tsang's vocational-rehabilitation expert opined that Tsang can perform sedentary work, though he also opined that such work cannot provide the salary that Tsang previously earned.
Tsang sought recovery of $1.5 million for his future medical expenses, $50, 000 for his past lost earnings, $200,000 for his future lost earnings, and unspecified damages for his past and future pain and suffering.
Defense counsel contended that Tsang achieved a full recovery and that additional medical treatment is not necessary. The defense's expert neurologist opined that Tsang does not suffer a neurological disability, and the defense's expert orthopedist opined that Tsang does not suffer any other type of disability. The defense's expert radiologist opined that osteophytes and other degeneration suggested that Tsang's injuries stemmed from nontraumatic conditions that preceded the accident.
Defense counsel also contended that Tsang can resume his previous job, with no decrease of pay.
The parties negotiated a high/low stipulation: Damages could not exceed $3 million, but they had to equal or exceed $500,000.
Result Arbitrator John DiBlasi determined that Tsang's damages totaled $2. 4 million.
Insurer(s) Nationwide Mutual Insurance Co. for both defendants
Plaintiff Expert(s)  Peter S. Capotosto, M.S. CRC, vocational rehabilitation, Rochester, NY
    Stephen Huish, M.D., physical medicine, Bayside, NY
    Alan M. Leiken, Ph.D., economics, East Setauket, NY
Defense Expert(s)    Monette Basson, M.D., neurology, Woodside, NY
    Steven Mendelson, M.D., radiology, New York, NY
    Edward A. Toriello, M.D., orthopedics, Middle Village, NY
Editor's Note This report is based on information that was provided by plaintiff's and defense counsel.
 Max Mitchell

Exhibit "D"  -  PHOTOS OF PLAINTIFF IN HOSPITAL











Exhibit "E"  -  PHOTOS OF STEVEN PALMORE
PERFORMING













## AFFIRMATION OF SERVICE

MATTHEW SAKKAS, an attorney duly admitted to practice law before this Court, affirms to the truth of the following under penalty of perjury and pursuant to CPLR §2106:

I am not a party to this action, I am over 18 years of age and I reside in New York, New York.  On  March 20, 2012  I mailed a copy of the within *Plaintiff's Exhibits for Damages Hearing*  to the persons or firms listed below at the following addresses:

Xiamen Evere Sports Goods Co., Ltd.
Huatan Plant, Gaotin Village, Heshan Town
Hula District, Xiamen City
Fujian, CHINA

Lewis Johs Avallone Aviles LLP
Attorneys for Defendant Ontel
Attn: James F. Murphy, Esq.
425 Broad Hollow Road  - Suite 400
Melville, NY 11747

by enclosing a copy of same in a postpaid properly addressed envelope and depositing said

envelope in an official depository under the exclusive care and custody of the U.S. Postal

Service within New York State.

Dated: New York, New York
        March 20, 2012

SAKKAS, CAHN & WEISS,  LLP

Matthew Sakkas, Esq.
Attorneys for Plaintiff
150 Broadway- Suite 1307
New York, NY  10037
(212)  571-7171
Fax: (212)  571-7174

UNITED STATES DISTRICT COURT        Docket No.: 09-CV-5269 (WFK)(JO)
EASTERN DISTRICT OF NEW YORK

STEVEN PALMORE,

Plaintiff,

-v.-

ONTEL CORPORATION and XIAMEN EVERE SPORTS
GOODS CO., LTD.,

Defendants.

---

## *PLAINTIFF'S EXHIBITS FOR DAMAGES HEARING*

---

### *SAKKAS, CAHN & WEISS, LLP*
Attorneys for Plaintiff
150 Broadway, Suite 1307
New York, N.Y. 10038
Tel:(212)571-7171
Fax:(212)571-7174